IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DISH NETWORK CORPORATION (F/K/A ECHOSTAR COMMUNICATIONS CORPORATION), ECHOSTAR DBS CORPORATION, ECHOSTAR TECHNOLOGIES LLC (F/K/A ECHOSTAR TECHNOLOGIES CORPORATION), ECHOSPHERE LLC, AND DISH NETWORK LLC (F/K/A ECHOSTAR SATELLITE LLC), | ) ) ) ) ) ) ) ) ) ) | **REDACTED PUBLIC VERSION** |
| Plaintiffs, | ) ) | C.A. No. 08-327-JJF |
| v. | ) ) | |
| TIVO INC., | ) ) | |
| Defendant. | ) | |

## EXHIBIT A TO REPLY BRIEF IN SUPPORT OF TIVO'S MOTION TO DISMISS

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Defendants*

*Of Counsel:*

IRELL & MANELLA LLP
Morgan Chu
Christine Byrd
Laura W. Brill
Alexander C. Giza
William D. Bowen
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
(310) 277-1010

Dated:  August 25, 2008

{00236546;v1}

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

| | |
|---|---|
| TiVo Inc., a Delaware corporation,<br><br>                    Plaintiff,<br><br>    v.<br><br>1. EchoStar Communications Corporation, a Nevada corporation; 2. EchoStar DBS Corporation, a Colorado corporation; 3. EchoStar Technologies Corporation, a Texas corporation; 4. Echosphere Limited Liability Company, a Colorado limited liability company; and 5. EchoStar Satellite LLC, a Colorado limited liability company,<br><br>                    Defendants. | No.     2-04cv01 DF<br>          (Judge Folsom)<br><br>**THE ECHOSTAR DEFENDANTS' OPPOSITION TO TIVO'S MOTION FOR ECHOSTAR TO BE HELD IN CONTEMPT FOR VIOLATION OF THIS COURT'S PERMANENT INJUNCTION** |

**REDACTED VERSION (NOT CONFIDENTIAL)**

sf-2541656

## I.    INTRODUCTION

EchoStar has complied completely with this Court's Order that it disable the DVR functionality in its Infringing Products. Well before the Injunction went into effect, EchoStar disabled the infringing indexing hardware in its "Broadcom" boxes as well as the infringing DVR software in more than ███████ set-top boxes in the homes of subscribers around the country. EchoStar then installed new, non-infringing DVR software in those boxes. Left unaffected in this Herculean effort were far fewer than the 192,708 Infringing Products expressly permitted by the Injunction. Thus, EchoStar has complied not just with the spirit of this Court's Injunction, but with the letter as well.

TiVo knows these facts. Immediately after the mandate issued in this case, EchoStar voluntarily produced opinions of counsel describing its new, non-infringing products, as well as the actual software, to TiVo. TiVo analyzed that code. But TiVo does not want the Court to look at the merits of EchoStar's design-around. Instead, TiVo asks this Court to *ignore* the changes EchoStar made to its new DVRs and hold EchoStar in contempt for providing any DVRs at all, whether or not they infringe.

In fact, TiVo seeks through a motion for summary contempt what it did not, and could not, secure at trial: an order affording TiVo a monopoly over *all* DVR technology and, based on that monopoly, an order precluding EchoStar from providing its customers with *even non-infringing* DVR functionality. TiVo never asserted that it invented the DVR — it actually rejected that notion — nor did TiVo dispute the existence of many known, non-infringing DVR systems.[1] EchoStar's provision of new, non-infringing DVR systems to its customers is consistent with this Court's Injunction, which forbids only "Infringing Products."

Designing new, non-infringing products is *not* contemptuous conduct, but the type of competitive innovation that the patent laws were established to encourage. And it is EchoStar's

---

[1] For example, in response to the question whether "Jim Barton and TiVo invented the digital recording of TV," TiVo's expert, Dr. James Storer, testified: "No, of course not. . . . [T]here was lots of technology out there." (Declaration of Rachel Krevans in Support of EchoStar's Opposition to Contempt Motion ("Krevans") Ex. A (4/11/06 AM Trial Tr.) at 65:23-66:3.)

sf-2541656

right, as a matter of controlling Federal Circuit precedent. EchoStar is "entitled to design around the claims of a patent without the threat of contempt proceedings with respect to every modified device." *KSM Fastening Sys., Inc. v. H.A. Jones Co.*, 776 F.2d 1522, 1526 (Fed. Cir. 1985). Under *KSM* and its progeny, which TiVo completely ignores, the Court's Injunction cannot be read to preclude EchoStar from providing a product that is more than colorably different from the products found to infringe, and certainly not a product that does not itself infringe TiVo's patent. (*Id.* at 1530.)

## II.    STATEMENT OF FACTS

### A.    EchoStar Faced a Challenge After the Verdict

In April 2006, the jury returned a verdict finding that eight EchoStar DVR models infringed the '389 patent. EchoStar engineers immediately turned to the task of determining how to design around the '389 patent, in the event that an injunction issued and EchoStar did not prevail on appeal. EchoStar lawyers and engineers scrutinized the patent, the Court's claim construction order, the trial transcripts, and the verdict form in an effort to understand which design elements of the accused DVRs TiVo had identified as infringing. They faced the challenge of changing these design elements without the expensive and disruptive step of recalling millions of set-top boxes installed in their customers' homes. (Declaration of Dan Minnick in Support of EchoStar's Opposition to Contempt Motion ("Minnick Decl.") ¶ 3.)

By the time of the verdict, nearly eight years had passed since TiVo filed the application that gave rise to the '389 patent. In those years, the power of central processing units (CPUs) and memory, relative to their price, had increased dramatically. While it remained desirable to minimize the amount of processing power and memory demanded by a particular design, those constraints were not as limiting as they had been eight years earlier. EchoStar engineers thought that these technological advances might make a new DVR design possible. (*Id.* ¶¶ 3, 18.)

### B.    EchoStar Designed Non-Infringing Software

#### 1.    EchoStar's New Design Eliminated Pre-Storage Analysis and Indexing

The '389 patent explains that while digital video recording technology was known in 1998, making a low-cost DVR posed a challenge "because the processor requirements for keeping up with the high video rates makes the device expensive and problematic." (Krevans Ex. B ('389 patent) at 1:46-49.)  The '389 patent purports to solve that problem by employing a component called the "Media Switch" (also known as a "parser"). (*Id.* at 2:22-25, 6:16-25, 7:12-18.)  The "Hardware Claims" of the '389 patent require a Media Switch that "parses" the incoming television programming data; the Court construed "parse," at TiVo's urging, to mean "analyze." (Claim Construction Order (Docket No. 185) at 17.)  As inventor James Barton explained, the Media Switch "analyzes" the television programming data to create a table or index that facilitates efficient retrieval of the data when trick-play functions, such as fast-forward, rewind, and pause, are utilized.  (Krevans Ex. C (3/30/06 AM Trial Tr.) at 26:5-15; 29:8-22; 47:1-4.)  As Mr. Barton testified:

> The media switch analyzed the data coming in to the system; however, it came in as a -- as a digital signal to identify where these frame starts are and where these starts of the beginning pictures are.  And it separated out the video parts and the audio parts to create a table of where -- where the frames were.  And we associated that table, then, with the video and audio data when we stored it.  That allowed us, when we [perform] playback, to know precisely where these frame starts are so that we could properly send the television to the decoder.

(*Id.* at 26:5-15.).  Without such analysis and the resulting indexing, Mr. Barton testified, "Trickplay operations would be very crude, or we would need a very powerful processor." (*Id.* at 29:23-30:2.)

Although software claims 31 and 61 do not require the Media Switch, they call for "a physical data source" that "accepts broadcast data from an input device, *parses* video and audio data from said broadcast data, and temporarily stores said video and audio data." (Krevans Ex. B ('389 patent) at 14:55-58, 18:5-8 (emphasis added).)  Thus, all '389 patent claims required this

3

analysis function. According to TiVo's infringement expert, EchoStar's accused DVRs satisfied the parsing — or analyzing — function by generating what was referred to as a "table" or "index" that kept track of where frames started and where audio and video components were stored. (Krevans Ex. D (3/30/06 PM Trial Tr.) at 72:12-74:1; 100:16-103:2; 107:1-13.) On appeal, TiVo's counsel referred to the creation of this index or table as the "genius, the core of this invention" and told the Federal Circuit: "[T]hey [EchoStar] build the table, we [TiVo] build the table, and that is the invention here; that is the way in which a low-cost limited CPU device can manipulate these streams the way that they do." (Krevans Ex. E (Transcript of Oral Argument on Appeal, October 4, 2007) at 38-39.)

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(Krevans Ex. D (3/30/06 PM Trial Tr.) at 101:16-105:19.)

Post-verdict, EchoStar conceived an approach to develop software that performed DVR functions in a radically different way than the hardware and software that had been found to infringe. EchoStar's engineers conceived of a way to provide DVR functionality without any indexing at all — in other words, without analyzing television data prior to storage. Instead of relying on a "Media Switch" or "physical data source" (or any other hardware or software) to assist the CPU by analyzing data *before* storage, EchoStar's new DVR software relies on the brute force of the CPU *after storage* to perform trick-play operations. Such a solution is possible, in part, due to the relatively recent availability of processors that are both powerful and inexpensive. In this "indexless" design, no analysis of the television programming data takes place prior to storage. Instead, the data is stored as it is received, and the new software relies on statistical and probabilistic algorithms, upon playback, to search for and keep track of the program data as needed. During playback, the new software generates statistics that are used to determine the ideal number of frames to skip, the number of bytes to seek, and the read size during trick-play operation. EchoStar has applied for a patent on this novel approach to DVR functionality. (Minnick Decl. ¶¶ 4-6, 14-15, 18, 27.)

4

## 2. EchoStar's New Design Eliminated Automatic Flow Control in the Broadcom Boxes

In addition to parsing and indexing by the Media Switch and the physical data source, the '389 patent further explains that the "automatic flow control" feature of the invention helped reduce the costs then associated with DVR technology by limiting the amount of memory that was required. (Krevans Ex. B ('389 patent) at 8:60-65.) The patent describes "automatic flow control" as interplay between software objects (namely the source object, transform object, and sink object) filling and emptying a series of buffers to regulate the use of memory. (*Id.* at 8:34-65.) In the absence of automatic flow control, Mr. Barton testified, there was a risk of "losing information, of overriding memory, of not capturing the full television signal as it came in or being able to play it out properly." (Krevans Ex. C (3/30/06 AM Trial Tr.) at 54:2-9.) Mr. Barton explained the drawback of such a design: "[W]e have no flow controls so we're filling up our buffer, and we have now the potential of losing information, because we weren't able to stop the flow in order to wait for the buffer to become available." (*Id.* at 54:16-20.) TiVo's infringement expert, Dr. Gibson, testified that EchoStar's Broadcom DVRs satisfied the "automatically flow controlled" limitations of Claims 31 and 61. (Krevans Ex. F (3/31/06 AM Trial Tr.) at 47:7-49:23.) Both Mr. Barton and Dr. Gibson testified that where there is automatic flow control, there are multiple buffers and software (the source object) that fills the buffers with data. (*Id.* at 48:21-23; Krevans Ex. C (3/30/06 AM Trial Tr.) at 51:17-20.)

After the verdict, EchoStar's engineers developed a single-buffer record method that lacks automatic flow control for the Broadcom DVRs. Because only one buffer is used, the new software does not and cannot stop the flow of incoming data to the buffer.

(Minnick Decl. ¶¶ 4, 13, 27.)

5

### C.     EchoStar's Design-Around Efforts Were Not "Secret"

As discussed in Section IV.B.1 *infra*, design-arounds are encouraged and are a sign of good faith. TiVo attempts nonetheless to turn EchoStar's good-faith behavior into a negative, describing it as part of a "secretive strategy." (TiVo Opening Brief (Docket No. 832) at 9.) But there was nothing clandestine about EchoStar's redesign efforts. They were the subject of numerous SEC filings, beginning with EchoStar's August 9, 2006 Quarterly Report, which was filed with the SEC while TiVo's motion for a permanent injunction was pending. In that SEC document, EchoStar publicly disclosed that it was "working on modifications to our DVRs intended to avoid future infringement" in discussing the TiVo litigation. (*See* Krevans Ex. G.)[2] Moreover, while ultimately successful, EchoStar's redesigned software was by no means easy or quick to develop and implement. ███████████████████████████████

██████████████████████████████████████████████████████████

██████████████ (Minnick Decl. ¶¶ 8-12, 20-23.)

EchoStar engineers came up with the basic design concept that gave rise to the new software in May 2006. EchoStar proceeded with a feasibility study on those concepts, writing "test code" to see if the ideas could work in concept. EchoStar also retained the Fish & Richardson firm, which was not involved in the litigation, to render an opinion as to whether the proposed new designs would infringe the '389 patent. Having thoroughly investigated the issue, Robert E. Hillman, a Fish & Richardson partner and the former Chairman of the firm, cleared EchoStar's proposed designs, concluding in formal written opinions, supported by detailed

---

[2] (Dish Network Corp., Quarterly Report (Form 10-Q) at 18-19, 48, 52 (Aug. 9, 2006).) In its next quarterly filing on November 7, 2006, EchoStar referenced this Court's issuance of the Injunction and the Federal Circuit's stay, and then discussed what would happen if EchoStar was "not able to successfully implement alternative technology" (Krevans Ex. H (Dish Network Corp., Quarterly Report (Form 10-Q) at 19, 47 (Nov. 7, 2006)).) EchoStar reiterated these statements regarding the implementation of "alternative technology" in a series of subsequent SEC filings. Then, following the Federal Circuit decision, EchoStar disclosed in its February 26, 2008 Annual Report that its non-infringing design-around had been successfully deployed: "we have developed and deployed 'next-generation' DVR software to our customers' DVRs. This improved software is fully operational and has been automatically downloaded to current customers (the 'Design-Around'). We have formal legal opinions from outside counsel that conclude that our Design-Around does not infringe, literally or under the doctrine of equivalents, either the hardware or software claims of Tivo's patent." (Krevans Ex. I (Dish Network Corp., Annual Report (Form 10-K) at 35, F-42 (Feb. 26, 2008)).) Nothing about EchoStar's design-around process was "secretive."

6

analysis, that the designs do not infringe the claims of the '389 patent, either literally or under the doctrine of equivalents.  (Minnick Decl. ¶¶ 3-5, 9 & Exs. A-C.)  These opinions issued on August 24, 2006 and September 1, 2006.  (Minnick Exs. A-C.)  While TiVo implies that the opinions were the end of the matter and alleges that EchoStar had a design-around ready to install in customers' set-top boxes when it sought a stay, it did not.  (Minnick Decl. ¶¶ 10-12.)

The process of translating its design ideas into customer-ready products for the Infringing Products — the DP-501, DP-508, DP-510, DP-522, and DP-625[3] — was lengthy and included each of the following steps:

(Minnick Decl. ¶¶ 4, 10, 20.)

In late October 2006, after each of the foregoing steps had been completed for the DP-522 model, EchoStar was ready to begin installation of the first download stream of new code into customers' boxes.

Accordingly, the installation of the new software

---

[3] In light of the exemption of "192,708 units of the Infringing Products" expressly provided for in the Injunction, EchoStar decided not to implement redesigned software for the DP-721, DP-921, and DP-942 model Infringing Products.  So few of these models existed in the field that they would be easily accommodated by the 192,708-unit exemption.  Moreover, many of these DVR units were slated for replacement in the near future.  (Id. ¶ 25.)

7

disabled the DVR functionality of the set-top boxes and rid them of the old, infringing DVR software.  It also disabled the indexing hardware in the DP-522 boxes (one of the Broadcom models).  (Minnick Decl. ¶¶ 21-22.)

The full deployment of EchoStar's new software to millions of set-top boxes of different models was itself an involved process that took nearly six months, beginning in late October 2006 and finishing in early April 2007.



(Minnick Decl. ¶¶ 12, 15, 22-23.)

As new software was completed for each set of models, EchoStar rolled it out to subscribers as quickly as practicable, and in phases, so that only a subset of customers with a particular model receive new software at a given time.



(Minnick Decl. ¶ 12, 22.)

In sum, with enormous effort and the benefit of a transition period afforded by the Federal Circuit's stay order, EchoStar succeeded in disabling DVR functionality in the DP-501, DP-508, DP-510, DP-522, and DP-625 models, and replacing the software and hardware that had been found to infringe with EchoStar's new, non-infringing software, well before the mandate was entered in the District Court in April 2008.  Had the Federal Circuit not stayed this Court's Injunction on August 18, 2006, EchoStar would have been forced to disable the DVR functionality in millions of customers' set-top boxes and leave them without DVR features for a

period of weeks or months before the new, non-infringing DVR software could be delivered. (Minnick Decl. ¶ 24.)

## III.   ECHOSTAR COMPLIED FULLY WITH THE INJUNCTION WHEN IT DISABLED THE DVR FUNCTIONALITY IN ITS INFRINGING PRODUCTS

The Injunction ordered EchoStar to "disable the DVR functionality (i.e., disable all storage to and playback from a hard disk drive of television data) in all but 192,708 units of the Infringing Products that have been placed with an end user or subscriber." (Amended Final Judgment and Permanent Injunction (Docket No. 776) at 2.)  This EchoStar did.  Spooling software from its satellites, it disabled the DVR functionality in the DP-501, DP-508, DP-510, DP-522, and DP-625 models that it had already deployed in subscribers' homes.  This process took place on a rolling basis between late October 2006 and early April 2007, while the Injunction was stayed pending appeal.  Although EchoStar did not disable the DVR functionality in its DP-721, DP-921, and DP-942 models, those models existed in quantities that, taken together, fell far below the 192,708-unit threshold expressly permitted by the Injunction. (Minnick Decl. ¶¶ 21-23, 25.)  EchoStar accordingly is, and at all times has been, in full compliance with the Injunction.

TiVo now takes the untenable position that EchoStar violated the injunction because, after disabling the DVR functionality in its Infringing Products, EchoStar immediately supplied those units with new software that provides DVR functionality *without* infringing TiVo's patent. TiVo's argument is inconsistent with the plain language of the injunction, has been soundly rejected in the case law, is contrary to TiVo's own arguments to this Court in support of the Injunction in 2006, and turns on its head the fundamental purpose of injunctive relief in patent cases, namely, to prevent a competitor from continuing to sell products that infringe plaintiff's patent.

By its plain terms, the Injunction, including the "disable DVR functionality" clause, can only cover "Infringing Products," not the non-infringing technology EchoStar has now deployed. It does violence to the natural meaning of the phrase "Infringing Products" to argue, as TiVo

does, that it encompasses units supplied with EchoStar's non-infringing software. TiVo cannot argue that any of EchoStar's boxes infringe any of the "hardware" claims of the '389 patent. The Federal Circuit reversed the judgment of infringement as to all of those claims (claims 1, 5, 21, 23, 32, 36 and 52). *TiVo, Inc. v. EchoStar Commc'ns Corp.*, 516 F.3d 1290, 1312 (Fed. Cir. 2008). And TiVo does not argue that the boxes supplied with new software infringe any of the "software" claims of the patent. On the contrary, it is TiVo's position that enabling DVR functionality in *any* of the model numbers listed in the Injunction violates the injunction, regardless of whether the DVR technology infringes TiVo's patent. But, of course, if the software used in an EchoStar product has been *changed* so that the software claims are no longer infringed, the product can no longer meet the definition of an "Infringing Product," so DVR capability can be enabled without violating the Injunction.

This is true irrespective of whether a DVR-capable unit is still identified by a model number called out in the Injunction. TiVo implies that EchoStar should be held in contempt because it provides its non-infringing, redesigned software in hardware that uses the same DVR model number as a formerly Infringing Product. Another district court in the Fifth Circuit has already found that this label-over-substance argument "lacks merit." *Star Brite Distributing, Inc. v. Gavin*, 746 F. Supp. 633, 644 n.3 (N.D. Miss. 1990). In *Star Brite*, the defendant had "continue[d] to market the six products named in [the] court's injunction" but (as here) had modified certain key internal features of the products. *Id.* at 641. As TiVo does here, the patentee "argue[d] that the injunction should be read as requiring defendant to cease the manufacture and sale of any product using the same brand names as were listed in the injunction." *Id.* at 644 n.3. The court rejected this theory: "First, the court believes that its intention to enjoin the production of only the infringing formulation was clear. Second, injunctions as broad as plaintiff's proposed reading are disapproved. And third, such a reading would not constitute a clear order of the court for purposes of a motion for contempt." *Id.* (citation omitted). As in *Star Brite*, the Injunction issued by this Court was a "clear order" that cannot accommodate TiVo's current, overbroad reading.

10

Although TiVo asserts that in crafting the Injunction, this Court rejected EchoStar's position that the Injunction should be limited only to infringing software (TiVo Opening Br. at 3.), TiVo is wrong.[4] Indeed, in advocating to this Court for this Injunction in 2006, even TiVo recognized that the Injunction would not prohibit EchoStar from deploying design-around technology. TiVo's brief assured the Court that it sought to enjoin "*infringement* of the patent by devices adjudged to infringe and *infringement* by devices no more than colorably different therefrom," adding for emphasis, "nothing more, nothing less." (TiVo Reply re: Mot. for Entry of Judgment and Permanent Injunction (Docket No. 744) at 10 (emphasis added).) At the hearing on whether to grant an injunction, TiVo acknowledged that non-infringing, design-around technology was permitted. Specifically, Mr. Chu criticized EchoStar for not having previously done "what it can do now to design around" TiVo's patent. (Krevans Ex. J (6/28/06 Hearing Tr.) at 105:15-17.) Although there were several other disagreements about the proper scope of any injunction, this was the only discussion of design-around technology.

In short, therefore, TiVo previously recognized that the Injunction would *allow* EchoStar to design around the '389 patent. TiVo's current position to the contrary is a complete, and unjustified, turnaround.

## IV.    THE INJUNCTION CANNOT BE READ TO PRECLUDE DESIGN-AROUNDS

It is no surprise that this Court's Injunction is limited to Infringing Products and does not reach software designed to provide DVR functionality in a non-infringing manner. Under established Federal Circuit authority, an injunction following a finding of patent infringement can cover only products found to have infringed, and products that are not more than colorably different from them. This Court's injunction properly follows this law.

---

[4] In making its argument TiVo misleadingly emphasizes the word "infringing" in quoting EchoStar's argument that any injunction should be limited only to "the provision of infringing DVR software . . . upon activation." (TiVo Opening Br. at 3.) In fact, the parties' dispute at the time was not over whether to enjoin only infringing DVR software but over whether the injunction should require a recall of set-top boxes. (Krevans Ex. J (6/28/06 Hearing Tr.) at 134:5-21; Giza Decl. Ex. B at 17.) During oral argument on that issue, TiVo agreed that set-top boxes need not be "physically returned" because EchoStar could "send down software to disable the infringing features while leaving in place 100% of the functionality that is non-infringing." (Krevans Ex. J (6/28/06 Hearing Tr.) at 144:25-145:17.)

**A.    Federal Circuit Law Applies Here, and Provides that Contempt Proceedings Are Appropriate Only When the Accused Product Infringes**

The proper legal framework for the issue before the Court was enunciated in *KSM* and recently summarized by the Federal Circuit in reversing a finding of contempt in a patent case:

> [B]efore entering a judgment of contempt of an injunction in a patent infringement case, a district court must address two separate questions. First, the district court must address whether a contempt hearing is an appropriate forum for adjudging whether an allegedly redesigned product is infringing. *KSM Fastening Sys.*, 776 F.2d at 1532; *Additive Controls*, 154 F.3d at 1349-50. In doing so, the district court must compare the accused product with the original infringing product. If there is "more than a colorable difference" between the accused product and the adjudged infringing product such that "substantial open issues with respect to infringement to be tried" exist, contempt proceedings are not appropriate. *KSM Fastening*, 776 F.2d at 1532.

*Abbott Labs. v. TorPharm, Inc.*, 503 F.3d 1372, 1379-80 (Fed. Cir. 2007). The Federal Circuit very recently made it clear in the claim preclusion context that there will always be "more than a colorable difference" between two products unless they are "essentially the same." *Acumed LLC v. Stryker Corp.*, 525 F.3d 1319, 1324 (Fed. Cir. 2008) ("Accused devices are 'essentially the same' where the differences between them are merely 'colorable' or 'unrelated to the limitations in the claim of the patent.").

Where contempt proceedings are appropriate because the products are ***not*** colorably different, the district court must expressly answer a second question:

> [W]hether the accused product infringes the claims of the asserted patent. To show infringement the patentee must prove by clear and convincing evidence that the modified device falls within the admitted or adjudicated scope of the claims.

*Abbott*, 503 F.3d at 1380-81; *see also* 35 U.S.C. § 283 (courts "may grant injunctions" only "to prevent violation of any right secured by patent"); *Laitram Corp. v. Cambridge Wire Cloth Co.*, 863 F.2d 855, 867 (Fed. Cir. 1988) ("Absent infringement, there cannot be contempt for violating an injunction."); *KSM*, 776 F.2d at 1528 ("Infringement is the *sine qua non* of violation of an injunction against infringements.").

TiVo simply ignores the solid wall of Federal Circuit cases that mandates that a finding of contempt in a patent case *must* be predicated on infringement. Instead, TiVo tries to take refuge in Fifth Circuit contempt precedent by pretending that this is a procedural issue divorced

12

from substantive patent law. In *Abbott*, however, the Federal Circuit confirmed that its own law governs this issue: "We review the district court's decision to entertain a contempt proceeding for an abuse of discretion, applying Federal Circuit law," and "[w]e review the district court's finding of contempt for an abuse of discretion, again applying Federal Circuit law." 503 F.3d at 1380, 1381-82; *see also Int'l Rectifier Corp. v. Samsung Elecs. Co.*, 361 F.3d 1355, 1359 (Fed. Cir. 2004).

In taking the contrary position — and apparently to rationalize its failure even to mention the seminal *KSM* opinion — TiVo cites *Eagle Comtronics, Inc. v. Arrow Commc'n Labs., Inc.*, 305 F.3d 1303 (Fed. Cir. 2002) for the following proposition: "Because civil contempt proceedings are not unique to patent law, regional circuit law applies." (TiVo Opening Br. at 6.) TiVo fails to disclose that the issue that engendered the contempt proceeding reviewed in *Eagle* was "an Order to Show Cause why plaintiff and its counsel should not be held in civil contempt and sanctioned for violating the protective order" based on misuse of a "Confidential" patent application produced during discovery. *Eagle*, 305 F.3d at 1312. The *Eagle* panel, in turn, cited *Spindelfabrik* for the proposition that "civil contempt proceedings are not unique to patent law," *id.* at 1313, but the portion of *Spindelfabrik* applying regional circuit law was concerned only with "contempt damages," as a reading of that case makes clear. *See Spindelfabrik Suessen-Schurr Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik*, 903 F.2d 1568, 1578-79 (Fed Cir. 1990).

Yet another case cited in TiVo's Motion reveals the distinguishing factor that TiVo has attempted to sweep under the rug on the choice of law issue: "Regional circuit law governs contempt proceedings *that do not raise issues unique to patent law.*" *Schaefer Fan Co. v. J&D Mfg.*, 265 F.3d 1282, 1289 (Fed. Cir. 2001) (citing *Spindelfabrik*) (emphasis added). As recognized by the litany of cases that have consistently applied *KSM* when deciding whether an infringer has violated an injunction in a patent case, *including cases from this District*, the issue now before this Court is unique to patent law and Federal Circuit precedent applies. *See Abbott*, 503 F.3d at 1380-82. In an Order rejecting contempt accusations in *National Instruments*

13

*Corp. v. The Mathworks, Inc.*, Civil Docket No. 2:01-CV-0011 (E.D. Tex.), Judge Ward cited only *KSM* in finding that the defendant's new version of its product was "more than colorably different from the product found to infringe at trial" such that a contempt proceeding would not be appropriate. (*See* Krevans Ex. K.)

TiVo is, of course, well aware of *KSM* (which was cited in EchoStar's May 23, 2008 letter to the Court; Docket No. 826 at 5) and its dispositive impact on the contempt issue, but has sought to distract the Court from the real law in favor of baseless accusations about clandestine behavior and irrelevant *ad hominem* attacks. TiVo's argument is contrary to all applicable Federal Circuit precedent.

**B.     Under Federal Circuit Precedent, an Injunction Cannot Be Read to Preclude a "Design-Around" and a Finding Of Contempt Cannot Be Predicated Upon a Non-Infringing Product**

**1.     "Designing Around" a Patent Is a Good Thing**

"Designing around" a patent is not a deceitful act deserving of contempt. In fact, "patent law encourages competitors to design or invent around existing patents." *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999). Design-arounds are an indicator of good faith. *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1465 (Fed. Cir. 1997) They spur innovation and are encouraged under patent law. *WMS Gaming*, 184 F.3d at 1355; *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 828 (Fed. Cir. 1992); *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed. Cir. 1991). To comply with the Injunction's requirement to "disable the DVR functionality . . . in the Infringing Products," even while the injunction was stayed, EchoStar designed around the '389 patent such that its products no longer infringe *any* claims, including the only two claims on which the Federal Circuit affirmed infringement. In fact, and of relevance to any subsequent assessment of whether EchoStar's redesign is colorably different from the Infringing Products, EchoStar's redesign is the subject of a published patent application (*see* Minnick Ex. D) that could result in a patent to EchoStar. *See Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 154 F.3d 1345, 1350 (Fed. Cir. 1998) ("[I]n some

instances a showing that a redesign has resulted in the issuance of a patent would be sufficient to require a separate lawsuit to litigate any potential infringement by the redesigned device.").

What EchoStar did in redesigning its software and disabling the indexing hardware in the Broadcom boxes to avoid the '389 Patent while concurrently seeking to stay the Injunction and then contest the appeal was the proper response by a company found to have infringed following a patent trial. As Federal Circuit Judge Rader remarked recently in a concurring opinion, "Medtronic [the alleged infringer] had suffered an injunction. It deliberately sought to design around the patented technology – a response that patent law encourages." *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 480 F.3d 1335, 1347 (Fed. Cir. 2007) (Rader, J. concurring); *cf. State Indus.*, 751 F.2d at 1235-36 ("One of the benefits of the patent system is its so-called 'negative incentive' to 'design around' a competitor's products, even when they are patented, thus bringing a steady flow of innovations to the marketplace. It should not be discouraged by punitive damage awards . . . .").

### 2. A Finding Of Contempt Must Be Predicated Upon An Infringement Established By Clear And Convincing Evidence

Given that civil contempt "is a severe remedy," the Supreme Court long ago recognized that contempt "should not be resorted to where there is fair ground of doubt as to the wrongfulness of the defendant's conduct." *Cal. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885); *see also MAC Corp. of Am. v. Williams Patent Crusher & Pulverizer Co.*, 767 F.2d 882, 885 (Fed. Cir. 1985) (citing "this well-settled principle" in affirming a finding of no contempt of an injunction in a patent case). Because of the severity of the remedy, "[t]here must be *clear and convincing evidence* of patent infringement to support a district court's finding of contempt." *Abbott*, 503 F.3d at 1382 (citing *KSM*, 776 F.2d at 1532) (emphasis added). *See also Arbek Mfg., Inc. v. Moazzam*, 55 F.3d 1567, 1570 (Fed. Cir. 1995) (same).

"The grant of a contempt order for violation, by a modified device, of an injunction against infringement requires that the modified device *infringes* the patent," *Bass Pro Trademarks, L.L.C. v. Cabela's, Inc.*, 485 F.3d 1364, 1368 (Fed. Cir. 2007) (emphasis added).

sf-2541656

TiVo offers no proof at all that any of the accused models still infringe claims 31 and 61 of the '389 patent, let alone the required clear-and-convincing evidence. *See Abbott*, 503 F.3d at 1380-81. Nor has TiVo proven that EchoStar's design-around is not colorably different, *i.e.*, essentially the same, as the products that were adjudged to infringe. *Id.* at 1380; *cf. Acumed LLC*, 525 F.3d at 1324. The most TiVo offers is to assert in passing its unsupported conclusion that its "preliminary review of EchoStar's allegedly modified software suggests that it is not colorably different from EchoStar's adjudged infringing software and that it continues to infringe the Barton Patent." (TiVo Opening Br. at 8 n.5.) This is a legally inadequate foundation for the severe remedy of contempt, as "the doctrine of *KSM* protects an enjoined party from contempt judgments on non-infringing devices." *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 986 F.2d 476, 480 (Fed. Cir. 1993). Here, there is far more than a "fair ground of doubt" about the purported "wrongfulness of [EchoStar's] conduct." *See Cal. Artificial Stone Paving*, 113 U.S. at 618.

### 3. No Principle Required EchoStar to Seek this Court's Approval Before Launching Its Design-Around

Seeking to avoid Federal Circuit precedent in *KSM*, as well as Supreme Court precedent in *California Artificial Stone Paving*, TiVo asserts that Federal Circuit precedent required EchoStar to seek this Court's approval before it launched its design-around. (TiVo Opening Br. at 11-12.) But the two cases TiVo relies on in making its argument — *Spindelfabrik* and *Additive Controls* — are wholly inapposite. Those cases involved injunctions containing explicit "advance approval requirements" for design-arounds, because in both of those "exceptional cases," there had already been a finding of contempt, and the district courts were fashioning remedies to prevent *additional* contemptuous conduct.

In *Spindelfabrik*, the district court originally entered an injunction that, like this Court's Injunction, contained no requirement of advance approval before implementation of a design-around. The court later broadened its original injunction following "defendants' repeated and 'flagrant' violations of the district court's earlier injunction." 903 F.2d at 1577. As the Federal

16

Circuit recounted in *Additive Controls*, the district court in *Spindelfabrik* had "considered the broad injunction to be necessary in light of the repeated past violations of the original injunction." 154 F.3d at 1356 (noting that it was the fourth instance in which the defendants' conduct violative of the injunction had come to the court's attention). The district court in *Additive Controls* relied upon the *Spindelfabrik* decision to broaden an existing injunction in similar circumstances. *See id.* The broadened injunctive relief granted in *Spindelfabrik* and *Additive Controls* was only appropriate because the defendants had been serial contemnors in the same case, which EchoStar is assuredly not (irrespective of TiVo's bid to dredge up irrelevant issues from unrelated litigation).[5] The Federal Circuit made crystal-clear that "such broad injunctions should be used only in *exceptional* cases," *Additive Controls*, 154 F.3d at 1356 (emphasis added), in which an infringer has *already violated an injunction*.

In sum, neither *Spindelfabrik* nor *Additive Controls* even remotely stands for the proposition that a party subject to the standard injunction language of this Court's order prohibiting further infringement of a patent must seek court approval before launching a design-around. Both cases involved injunctions whose original terms had been expressly broadened to require the defendant to seek judicial approval before deploying a design-around. The Injunction in this case has no such requirement. TiVo never requested such a provision, and the Court wisely did not add one *sua sponte*, as this is not an "exceptional" case in the context of TiVo's inapposite authority (or otherwise). There was, accordingly, no reason for EchoStar to have acted as though a non-existent pre-clearance requirement were in place in this case.

---

[5] EchoStar will not dignify TiVo's mud-slinging attack (*see* TiVo Opening Br. at 12-14) with a point-by-point rebuttal, because what may have transpired in *other* cases – *even if true* – is totally irrelevant to the legal issue before the Court in *this* case. As for TiVo's allegation about what happened "in connection with a subpoena issued in this case in Georgia" (*id.* at 13), the salient fact is that EchoStar turned over all of the Merchant & Gould documents it was required to disclose under *In re EchoStar*. Thus, to this day it remains only TiVo's counsel, not EchoStar's, who has been reprimanded for its conduct in this case. *See* Aug. 4, 2005 Order (Docket No. 158) (reprimanding TiVo's counsel for unprofessional conduct with respect to a deposition witness).

**4.    To the Extent There Is Ambiguity in the Injunction, Any Ambiguities Must Redound to EchoStar's Benefit**

EchoStar believes that the language of the Injunction is clear and unambiguous, especially when read in context of the proceedings that led to the Injunction, and the applicable case law limiting injunctions to infringing products. However, to the extent that the language of the Injunction is not crystal-clear regarding whether it covers products that do not infringe — *which it cannot as a matter of law* — the language must be construed in EchoStar's favor as the alleged contemnor. *See Abbott*, 503 F.3d at 1382-83. "[C]ontempt is a shield protecting the patentee against an infringer's flagrant disregard for court orders," not "a sword for wounding a former infringer who has made a good-faith effort to modify a previously adjudged or admitted infringing device to remain in the marketplace." *Arbek Mfg.*, 55 F.3d at 1570.

**V.    ECHOSTAR IS NOT COLLATERALLY ATTACKING THE INJUNCTION; IT IS MERELY ASKING THAT THE INJUNCTION BE INTERPRETED AS REQUIRED BY FEDERAL CIRCUIT PRECEDENT**

Although TiVo asserts that EchoStar is collaterally attacking the Injunction (TiVo Opening Br. at 6-7), there is a big difference between collaterally attacking an injunction and simply arguing, as EchoStar is, that the Injunction was not violated. *See United States v. Smith*, 502 F. Supp. 2d 852, 858 (D. Minn. 2007); *Star Brite*, 746 F. Supp. at 644 n.3. The Injunction was issued consistent with Rule 65(d) to enjoin "*Infringing* Products" and should be construed and applied in that vein. EchoStar is not attacking the Injunction in asking the Court to reject TiVo's gross misinterpretation of the Injunction to encompass non-infringing design-arounds. Indeed, faced in the *Abbott* case with a similar "collateral attack" argument by the patent owner, the Federal Circuit apparently found it of so little merit that it ignored the argument altogether, deciding that under *KSM*, the accused contemnor had done nothing wrong.[6]

---

[6] During the appellate briefing that lead to the Federal Circuit's reversal of a contempt finding in *Abbott, supra*, the patentee made TiVo's "collateral attack/waiver" argument and even cited the same Fifth Circuit decision cited by TiVo:

> Apotex cannot contest the language of the Injunction as the time for that has long since past. In its post-trial appeal, Apotex raised no challenge to the scope of the Injunction. Having waived this opportunity to contest the injunction on direct appeal, Apotex is barred from doing so now. *See W. Water Mgmt., Inc. v. Brown*, 40 F.3d 105, 108 (5th Cir. 1994) (validity and scope of a permanent injunction may not be collaterally attacked in an enforcement proceeding if earlier appellate review was available).

sf-2541656

Finally, even if this Court were to conclude that EchoStar had misunderstood the

Injunction, and hold that its terms would, interpreted literally, apply to DVR functionality and

products irrespective of whether the product infringed TiVo's patent, the Injunction should *still*

not be read so as to encompass anything other than infringing products. The Federal Circuit has

provided guidance about what a trial court is to do in such a situation:

> If a trial court is faced with an overly broad injunction during a contempt
> proceeding, the court should interpret it according to the rule of law quoted from
> KSM above.

*Int'l Rectifier*, 383 F.3d at 1316. The referenced "rule of law" from *KSM* provides that contempt

proceedings are available "only with respect to devices previously admitted or adjudged to

infringe, and to other devices which are no more than colorably different therefrom and *which*

*clearly are infringements of the patent*." 383 F.3d at 1316 (quoting *KSM*, 776 F.2d at 1526)

(emphasis added).[7]

In short, the Injunction, properly interpreted, encompasses only infringing products and

products not colorably different therefrom. But even if a literal reading of the Injunction might

justify a broader coverage, the Injunction would still be limited in this manner. Under Federal

Circuit precedent, a finding of contempt can be obtained here only if TiVo can show that

EchoStar's design-around actually infringes. TiVo has already examined EchoStar's new design

and, unable to come up with any cogent argument that it still infringes the patent, has resorted

instead to asking this Court to *ignore* whether EchoStar is still infringing and simply hold

EchoStar in contempt for not putting new model numbers on set-top boxes where it changed the

---

(Krevans Ex. L at 27 n.3 (*Abbott Labs. v. TorPharm, Inc.*, No. 2007-1019, dated Jan. 24, 2007).) The Federal Circuit ignored this argument, and decided the issue in favor of the alleged contemnor under the two-part framework established by *KSM*, without even mentioning collateral attack. This Court should similarly disregard TiVo's "collateral attack" argument.

[7] Even taking TiVo's "collateral attack" argument at face value, an exception would apply if the Injunction were as overbroad as TiVo maintains. *See Walker v. City of Birmingham*, 388 U.S. 307, 315 (1967) (a contemnor might be allowed to challenge contempt citation on ground that underlying court order was "transparently invalid"); *Martin v. Wilks*, 490 U.S. 755, 785 (1989) (a consent judgment may be "subject to reopening and further litigation because the relief it afforded was so out of line with settled legal doctrine that it 'was transparently invalid or had only a frivolous pretense to validity.'") (quoting *Walker*, 388 U.S. at 315).

software.  TiVo's attempt to sidestep the merits is telling — and is contrary to all Federal Circuit precedent.

## VI.    CONCLUSION

EchoStar respectfully requests that this Court find that EchoStar did not violate the Injunction in developing a novel design-around of the only two claims of the '389 Patent that were found by the Federal Circuit to have been infringed.  EchoStar has complied with both the letter and the spirit of the Injunction, which cannot be read in the overbroad manner advocated by TiVo in an attempt to lay claim to *all* DVR technology, irrespective of whether it meets the limitations of the claims of its patent.  The Federal Circuit has repeatedly held that courts may not read injunctions to ensnare non-infringing products, and EchoStar's disabling of its indexing hardware and DVR software and installation of its new software has taken its DVRs outside the reach of TiVo's limited monopoly.  TiVo's attempt to misuse its patent to monopolize that which it did not invent is a gross abuse of the contempt process.

EchoStar complied with the injunction by "disabling the DVR functionality" in all but fewer than 192,708 Infringing Products and then installing new DVR functionality using non-infringing software.  As a matter of law, EchoStar cannot be found to be in contempt for innovating around the claims of TiVo's patent.

Respectfully submitted,

Dated:  June 30, 2008                    MORRISON & FOERSTER LLP

By:    /s/ Rachel Krevans
        Rachel Krevans

        Harold J. McElhinny (*Pro Hac Vice*)
        Rachel Krevans (*Pro Hac Vice*)
        MORRISON & FOERSTER LLP
        425 Market Street
        San Francisco, California 94105-2482
        Telephone:  (415) 268-7000
        Facsimile:  (415) 268-7522

Damon Young
YOUNG PICKETT & LEE
Post Office Box 1897
4122 Texas Boulevard
Texarkana, Texas 75504
Telephone: (903) 794-1303
Facsimile: (903) 792-5928

Attorneys for Defendants ECHOSTAR
COMMUNICATIONS CORPORATION,
ECHOSTAR DBS CORPORATION,
ECHOSTAR TECHNOLOGIES
CORPORATION, ECHOSPHERE
LIMITED LIABILITY COMPANY, and
ECHOSTAR SATELLITE LLC


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 30, 2008, all counsel of record who are deemed to have consented to electronic service are being served with a copy of the foregoing document via the Court's CM/ECF system per Local Rule CV-5(a)(3).

/s/ Rachel Krevans
Rachel Krevans


## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

This is to certify that this motion should be filed under seal because it contains material covered by the protective order approved and entered in this case as the Stipulated Protective Order of February 7, 2005 [Docket No. 49].

/s/ Rachel Krevans
Rachel Krevans

sf-2541656